ORIGINAL

1  GREGORY C. LOARIE (CA Bar # 215859)
   Earthjustice
2  426 Seventeenth Street, 5th Floor
   Oakland, CA 94612
3  (510) 550-6725
4  (510) 550-6749 [fax]
   gloarie@earthjustice.org
5
   R. CLAYTON JERNIGAN (AK Bar # 0611099)
6  ERIC P. JORGENSEN (AK Bar # 894010)
   Earthjustice
7  325 Fourth Street
8  Juneau, AK 99801-1145
   (907) 586-2751
9  (907) 463-5891 [fax]
   cjernigan@earthjustice.org
10 ejorgensen@earthjustice.org
11 *Pro hac vice* (applications to be filed)

12 BRENDAN CUMMINGS (CA Bar # 193952)
   Center for Biological Diversity
13 P.O. Box 549
   Joshua Tree, CA 92252
14 (760) 366-2232 x304
15 (760) 366-2669 [fax]
   bcummings@biologicaldiversity.org
16
   Attorneys for Plaintiffs Center for Biological Diversity
17 and Pacific Environment

18

19

20

21

22

23

24

25

26

27

28

FILED

FEB 1 3 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

EDL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY and
PACIFIC ENVIRONMENT,

      Plaintiffs,

      v.

DIRK KEMPTHORNE, Secretary of the Interior,
and UNITED STATES FISH AND WILDLIFE
SERVICE,

      Defendants.

Case No. 07 0894

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Administrative Procedure Act Case

(Administrative Procedure Act, 5 U.S.C. §§
702-706; Marine Mammal Protection Act, 16
U.S.C. § 1361 *et seq.*; National Environmental
Policy Act, 43 U.S.C. § 4321 *et seq.*)

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1

1

## I. INTRODUCTION

2      1.      In this civil action for declaratory and injunctive relief, Plaintiffs Center for Biological

3   Diversity and Pacific Environment challenge the failure of Defendants Dirk Kempthorne, United States

4   Secretary of the Interior, and the United States Fish and Wildlife Service (collectively "FWS") to

5   comply with the Marine Mammal Protection Act ("MMPA") (16 U.S.C. § 1361 *et seq.* (2006)), and the

6   National Environmental Policy Act ("NEPA") (42 U.S.C. § 4321-4370f (2006)) in promulgating

7   regulations authorizing the "incidental take" of otherwise protected polar bears and Pacific walrus from

8   industrial oil and gas exploration, development, and production activities in the Arctic.

9      2.      Plaintiffs challenge a final rule promulgated by FWS on August 2, 2006 pursuant to the

10   MMPA that authorizes the "incidental take" of polar bears and Pacific walrus for five years resulting

11   from any oil and gas industry activities in the Beaufort Sea and the adjacent coastal areas. *See* Marine

12   Mammals; Incidental Take During Specified Activities, 71 Fed. Reg. 43,926 (Aug. 2, 2006) (codified

13   at 50 C.F.R. § 18.121-.129). Plaintiffs also challenge the accompanying Environmental Assessment

14   and "finding of no significant impact" issued by FWS pursuant to NEPA, which purport to analyze the

15   environmental impacts of the authorized take of polar bears and Pacific walrus.

16      3.      Over the past decade, global warming has dramatically altered the Arctic, causing

17   significant reductions in sea ice, and adversely affecting ice-dependent species such as the Pacific

18   walrus and polar bear. In just the past three years, polar bears have for the first time been documented

19   drowning from lack of sea ice, dying from starvation or resorting to cannibalism from lack of access to

20   food, suffering greatly reduced cub survival, and shifting from denning primarily on ice to denning

21   primarily on land. The Southern Beaufort Sea population of polar bears, the population affected by the

22   take regulations, has been recently reclassified by experts from being "stable to increasing" to being

23   "likely declining." Recently, FWS considered the threats to polar bears from global warming to be of

24   sufficient magnitude that the agency proposed listing the species as "threatened" under the Endangered

25   Species Act ("ESA") (16 U.S.C. §§ 1531-1544 (2006)). *See* Endangered and Threatened Wildlife and

26   Plants; 12-Month Petition Finding and Proposed Rule To List the Polar Bear (Ursus maritimus) as

27   Threatened Throughout its Range, 72 Fed. Reg. 1,064 (Jan. 9, 2007). The Pacific walrus, while less

28   studied than the polar bear, is also suffering from the changes wrought by global warming, with, for

COMPLAINT FOR DECLARATORY                                                2
AND INJUNCTIVE RELIEF

example, recent documentation of unusual numbers of calves found separated from their mothers, swimming far from land and ice with virtually no chance of survival.

4. Notwithstanding the well-documented recent impacts of global warming on the polar bear and Pacific walrus, FWS promulgated its incidental take regulations for these species without seriously analyzing the effects of global warming on them or their habitat. This failing renders FWS's analyses and conclusions under the MMPA and NEPA arbitrary and capricious. Moreover, the incidental take regulations cover an overbroad range of activities and impermissibly rely on unimposed and uncertain mitigation measures in violation of the requirements of the MMPA.

## II. JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT

5. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706. The relief requested is authorized by 28 U.S.C. §§ 2201-2202.

6. Defendants have not remedied their violations of the MMPA and NEPA and are in violation of these statutes under the standards of review provided by the APA. There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgments).

7. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e) as this civil action is brought against an agency of the United States and an officer of the United States acting in his official capacity and under the color of legal authority, no real property is involved in this action and at least one Plaintiff resides in this judicial district.

8. Pursuant to Local Rules 3-5(b) and 3-2(c) and (d), assignment of this case to the San Francisco or Oakland Division is appropriate because at least one Plaintiff resides in San Francisco County.

## III. PARTIES

9. Plaintiff Center for Biological Diversity ("the Center") is a non-profit organization with offices in San Francisco, Joshua Tree and San Diego, California; Phoenix and Tucson, Arizona; Silver City, New Mexico; Portland, Oregon; and Washington, D.C. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center is actively involved in species and habitat protection issues throughout the United States, including protection of Arctic wildlife in general and the polar bear and Pacific walrus in

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

3

particular. These efforts include petitioning FWS to list the polar bear under the ESA. *See* 72 Fed. Reg. 1,065.

10. Plaintiff Pacific Environment is a non-profit organization based in San Francisco, California. Pacific Environment promotes conservation throughout the Pacific Rim via activism, funding local grassroots environmental organizations, and education. It actively advocates for greater protection of the Arctic marine environment and its inhabitants, including polar bears and Pacific walrus, from the harms caused by oil and gas exploration, development and production.

11. Plaintiffs' members, directors, and staff visit or otherwise use and enjoy the Beaufort Sea and adjacent coastal region for recreation, wildlife viewing, education, research, photography, or aesthetic and spiritual enjoyment, and enjoy or otherwise experience polar bears and/or Pacific walrus that inhabit the Beaufort Sea and adjacent coastal areas. For these reasons, the Plaintiffs' use and enjoyment of polar bears and Pacific walrus is entirely dependent on the continued existence of healthy, sustainable, and accessible populations of these species in the wild. Any activities, such as oil and gas exploration, development, and production activities, which destroy, degrade, or diminish polar bear and/or Pacific walrus habitat, or which kill, injure, harm, harass, or displace polar bears and Pacific walrus also by extension interfere with Plaintiffs' use and enjoyment of these species and their habitats. As such, these activities directly and irreparably injure the interests of Plaintiffs and their members, directors, and staff.

12. Because the MMPA prohibits the unpermitted take of polar bears and Pacific walrus, absent authorization for such take from FWS, none of these activities which harm these species and their habitats could lawfully occur in areas such as the Beaufort Sea subject to the jurisdiction of the United States. Therefore, the issuance of authorization for the taking of polar bears and Pacific walrus by FWS allows the initiation and continuation of activities that harm polar bears, Pacific Walrus, their habitats, and by extension, Plaintiffs interests.

13. Plaintiffs have also suffered informational and procedural injuries from FWS's failures to comply with the MMPA and NEPA in the issuance of the incidental take regulations. These injuries are connected to Plaintiffs' substantive conservation, recreational, scientific, and aesthetic interests. Plaintiffs' members, directors and staff rely on FWS to comply with the requirements of the MMPA

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

4

1 and NEPA to prepare adequate environmental analyses as called for by the statute. Plaintiffs rely on
2 these analyses to achieve their organizational purposes, including to monitor the use of the marine
3 environment and the management of marine wildlife, and compliance with the law concerning the
4 management of these species, educate their members, directors and staff, and the public concerning the
5 management of these species, and advocate policies that protect polar bears, Pacific walrus, and their
6 habitat. Without the proper preparation of these analyses, FWS, Plaintiffs, and the public at large are
7 denied essential information and the right to comment regarding the management of these resources.
8 These informational and procedural harms can only be remedied if FWS is made to comply with the
9 requirements of the MMPA and NEPA.

10    14.    Plaintiffs submitted comments to FWS on its proposed rule to authorize the incidental
11 take of polar bears and Pacific walrus during oil and gas activities in the Beaufort Sea and adjacent
12 coastal areas, Marine Mammals; Incidental Take During Specified Activities, 71 Fed. Reg. 14,446
13 (Mar. 22, 2006), and the Draft Environmental Assessment prepared in connection therewith.

14    15.    The interests and organizational purposes of the Plaintiffs will be directly and
15 irreparably injured by FWS's violations of law as described in this Complaint. Unless this Court grants
16 the requested relief and orders FWS to comply with the MMPA and NEPA, harm to the polar bear and
17 Pacific walrus will continue to accrue, and the aesthetic, recreational, educational, professional,
18 scientific, spiritual, moral, and conservation interests of Plaintiffs, their members, directors and staff
19 will continue to be adversely affected.

20    16.    Defendant Dirk Kempthorne, United States Secretary of the Interior, is the highest
21 ranking official within the Department of Interior and, in that capacity, has ultimate responsibility for
22 the administration and implementation of the MMPA with regard to the polar bear and Pacific walrus,
23 and for compliance with all other federal laws applicable to the Department of the Interior. He is sued
24 in his official capacity.

25    17.    Defendant United States Fish and Wildlife Service ("FWS") is a federal agency within
26 the Department of Interior authorized and required by law to protect and manage the fish, wildlife and
27 native plant resources of the United States, including enforcing the MMPA. FWS has been delegated
28 authority by the Secretary of Interior to implement the MMPA for the polar bear and Pacific walrus,

COMPLAINT FOR DECLARATORY                                                                    5
AND INJUNCTIVE RELIEF

1 including responsibility for making decisions and promulgating regulations, including the regulations at
2 issue in this suit.

## IV. LEGAL FRAMEWORK

### A. The Marine Mammal Protection Act

18. Congress enacted the MMPA in order to preserve currently healthy marine mammal populations and replenish waning marine mammal populations. 16 U.S.C. § 1361(2). The "primary objective" of the MMPA is maintaining the "health and stability of the marine ecosystem," through the retention of marine mammal populations as a "significant functioning element in the ecosystem of which they are a part. . . ." 16 U.S.C. §§ 1361(6), (2). "Whenever consistent with this primary objective, it should be the goal to obtain an optimum sustainable population keeping in mind the carrying capacity of the habitat." 16 U.S.C. § 1361(6).

19. To those ends, the MMPA imposes a general moratorium on the taking of marine mammals. 16 U.S.C. § 1371(a). Prohibited takings include actions that injure marine mammals or disrupt behavioral patterns, such as migration, breeding or sheltering.

20. In 1981, Congress amended the MMPA, creating a limited exception to the moratorium on taking for takings that occur incidental to a specified activity. 16 U.S.C. § 1371(a)(5). The amendment authorizes National Marine Fisheries Service or FWS to promulgate regulations, with a maximum duration of five years, that enable U.S. citizens who are engaged in a specified activity to take small numbers of marine mammals incidental to a specified activity. 16 U.S.C. § 1371(a)(5)(A). To ensure the purposes of the Act were achieved, Congress carefully circumscribed the ability of the agencies to authorize such incidental takings. The restrictions on incidental takings include the following: (1) the taking must be incidental to a "specified activity"; (2) the taking may only occur "within a specified geographical region"; (3) the agency may only authorize "incidental, but not intentional" takings; (4) only "small numbers" of a population may be taken; and (5) prior to authorizing incidental takings and after notice and opportunity for public comment, the agency must (a) find that "the total of such taking . . . will have a negligible impact" on the affected population; (b) find that the total of such takings "will not have an unmitigable adverse impact on the availability of [the population] for taking for subsistence uses"; and (c) prescribe regulations that (i) establish permissible

COMPLAINT FOR DECLARATORY                                                                6
AND INJUNCTIVE RELIEF

1  methods of taking; (ii) impose mitigation measures that minimize adverse impacts to the species and its
2  availability for subsistence harvest; and (iii) impose monitoring and reporting requirements.  16 U.S.C.
3  § 1371(a)(5)(A).

4       21.    FWS promulgated regulations that generally implement the incidental take provisions of
5  the MMPA.  *See* 50 C.F.R. § 18.27.  These regulations create a two-step process. FWS first issues
6  incidental take regulations that govern a specified activity, and then issues letters of authorization
7  (LOAs) to individual applicants, which authorize them to take incidentally marine mammals. Like the
8  statute, FWS's implementing regulations allow the agency to issue incidental take regulations only for
9  a specifically identified activity. *See* 50 C.F.R. § 18.27.

10      22.    To ensure all decisions related to marine mammals are made on the basis of the best
11  scientific information, Congress established the United States Marine Mammal Commission and
12  charged it to make recommendations to FWS on matters related to marine mammals. The MMPA
13  requires that any deviation from the Marine Mammal Commission's recommendations must be
14  explained in detail.  16 U.S.C. § 1402(d).

15  **B. The National Environmental Policy Act**

16      23.    Congress enacted NEPA in order to require federal agencies to incorporate
17  environmental concerns into the decision-making process.  42 U.S.C. § 4331(a).  In furtherance of this
18  goal, NEPA compels federal agencies prospectively to evaluate the environmental impacts of proposed
19  actions that they carry out, fund or authorize and ensures that the public participates in the decision
20  making process.

21      24.    NEPA requires federal agencies to prepare an environmental impact statement (EIS) for
22  any major federal action that may significantly affect the quality of the human environment.  42 U.S.C.
23  § 4332.  An agency may prepare an environmental assessment (EA) in order to determine whether a
24  proposed action constitutes a major federal action that significantly affects the quality of the human
25  environment.  40 C.F.R. § 1508.9.  An EA must evaluate reasonable alternatives to the proposed action.
26  40 C.F.R. § 1508.9(b).  If, after preparation of an EA, an agency decides to forgo preparation of an EIS,
27  it must issue a "finding of no significant impact" (FONSI) that explains why the impacts of the
28  proposed action are not significant.  40 C.F.R. § 1508.13.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

7

25. The regulations implementing NEPA identify several factors that indicate that the environmental effects of a proposed action are significant. These include the presence of highly uncertain impacts, highly controversial impacts, impacts to species listed as threatened under the Endangered Species Act, and cumulatively significant impacts. 40 C.F.R. §§ 1508.27(b)(4), (5), (7), (9).

## V. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Beaufort Sea, Pacific Walrus and Polar Bears

26. The Beaufort Sea is located off the northern coast of Alaska and western Canada. Its coast is peppered with scattered barrier islands, perforated by rivers and streams, and provides habitat to a host of wildlife species including caribou, an abundance of migratory birds, large carnivores, and marine mammals.

27. The Beaufort Sea is a dynamic arctic marine environment. Portions of the Sea seasonally fluctuate between solid, contiguous sea-ice, liquid sea-water, and various intermittent states. Changes in average ambient temperatures affect the extent, concentration and seasonal duration of sea-ice in the Beaufort Sea and throughout the Arctic.

28. The incidental take regulations issued by FWS cover the entire Beaufort Sea to the full extent of U.S. jurisdiction, and lands within twenty-five miles of the coast. The regulations do not cover any inland portion of the Arctic National Wildlife Refuge. Nevertheless, they do enable polar bears and Pacific walrus to be taken in the water or upon the landfast sea-ice adjacent to the Refuge.

29. Polar bears within the Southern Beaufort Sea comprise a single, distinct population, or "stock," *see* 16 U.S.C. § 1362(11). This population, estimated in 2002 to include between 1,800 and 2,200 individuals, occurs within the region that is covered by the incidental take regulations. Researchers for the U.S. Geological Service recently estimated that the Southern Beaufort Sea polar bear population numbers 1,526 individuals.

30. Polar bears' diet consists primarily of ringed seals and bearded seals. Polar bears occasionally do kill and eat marine mammals other than seals. Polar bears engage in limited foraging in terrestrial habitat. Terrestrial food sources do not compensate, however, for reduced availability of ringed seals. During time spent ashore, polar bears survival depends, in large part, on their utilizing

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

8

1  accumulated stores of body fat.

2      31.     Sea ice comprises polar bears' primary habitat, which they use for hunting, feeding and
3  mating. Polar bears preferentially hunt and kill seals at breathing holes, haul-outs and lairs on sea-ice.
4  Polar bears seldom kill seals in open water.

5      32.     In spring, polar bears mate on the sea ice. The onset of gestation is delayed for several
6  months. Reproduction places substantial energetic demands on females. Consequently, females may
7  forgo implantation and gestation of a fertilized ovum when prey availability is scarce during the
8  summer or fall.

9      33.     Generally, only pregnant polar bears hibernate. Females enter maternity dens between
10  late October and mid-November. Observational data indicate a trend of increasing utilization of
11  terrestrial habitat for denning by the Southern Beaufort Sea polar bear population.

12      34.     Denning females display heightened sensitivity to disturbances. Disturbances may
13  cause a female to abandon her maternity den prematurely. Disturbance may also prevent a pregnant
14  female from denning in her preferred location.

15      35.     Cubs are born between November and January. Newborn cubs are blind, generally
16  weigh less than a kilogram at birth and normally remain in the maternity den for approximately three
17  months as they grow strong enough to withstand conditions in the Arctic.

18      36.     During recent decades, the Arctic has warmed more rapidly than any other region on
19  earth. In Alaska, winter temperatures have increased by as much as three to four degrees (Centigrade)
20  during the past fifty years. The Arctic is expected to continue to warm at a faster rate than the rest of
21  the earth.

22      37.     Recent studies have observed perennial sea-ice disappearing at a rate of 9.2% per
23  decade during the past 25 years. During this time, average surface temperatures increased by one
24  degree (Centigrade). The decline in sea ice extent during the summer has been greater, with loss of
25  coverage reaching 15-20%. New record lows for summer sea-ice extent were set in 2002, 2004 and
26  again in 2005. In 2006, the extent of summer sea-ice was the fourth-lowest in recorded history.
27  Likewise, 2005 and 2006 each saw unprecedented 6% annual reductions in the maximum extent of
28  winter sea ice. The thickness of sea ice has also diminished during recent decades. Satellite imagery

COMPLAINT FOR DECLARATORY                                                                      9
AND INJUNCTIVE RELIEF

illustrates that the extent of summer sea ice in the Beaufort Sea has diminished since 1979. This reduction in the extent of sea ice in the Beaufort Sea increases the mean distance between the coast and the edge of the sea ice during late summer and fall. There is a direct, statistically significant correlation between the number of polar bears observed in near shore coastal areas during the fall and the mean distance to the edge of the sea ice. The retreat of sea ice has caused more bears to linger on the coast during late summer and fall.

38. In 2004, biologists observed four polar bears that had drowned while attempting to swim through expanses of open water during the fall. They estimated that forty polar bears drowned at this time. No records exist of polar bears drowning prior to 2004.

39. Throughout the Arctic, the length of the sea ice season is shortening. Recent studies indicate that across the Arctic, sea ice has retreated during an average of 13.1 additional days each decade.

40. Recent studies have demonstrated a statistically significant relationship between the timing of sea ice break-up and the condition of polar bears when they reach the shore in the late spring or early summer. Earlier break-up of sea ice has shortened polar bears' seal hunting season. As a consequence, polar bears have diminished fat stores during the open water period. This has resulted in declining reproductive rates, body mass, cub survival and subadult survival in the polar bear population that inhabits Western Hudson Bay. The reduced extent of sea-ice forces bears to travel greater distances when migrating and to swim greater distances to reach the shore. This increases the energy expenditure involved in migration and further contributes to individual bears' physical deterioration. Researchers have documented declines in the physical stature of adult male polar bears and the survival rate of cubs of the year in the Southern Beaufort Sea polar bear population, attributable to the reductions in sea ice wrought by global climate change.

41. Pacific walrus utilize the sea ice of the Beaufort Sea as a platform from which to dive to the sea floor to forage for the benthic species on which they feed. If the edge of the ice floe occurs over waters that are more than sixty meters deep, walrus cannot utilize the ice as a platform from which to effectively forage. As the ice edge in the Beaufort Sea retreats, the depth of underlying waters generally increases. In recent summers, the ice edge in the Beaufort Sea was often located above

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

10

waters that are over sixty meters deep. Researchers recently observed six orphaned walrus calves in the Beaufort Sea, an "exceptional" event which they attribute to reductions in the extent of sea ice attributable to global climate change. Such abandonment of calves may affect the population's rate of recruitment. Likewise, Pacific walrus may utilize the waters of the Beaufort Sea with increasing frequency during the summer months, in response to changes in sea ice in the Beaufort and Chukchi Seas.

**B. Legal Status of Polar Bears**

42. On December 27, 2006, FWS announced a proposal to list polar bears as a threatened species under the Endangered Species Act. *See* 72 Fed. Reg. 1,064. FWS concluded that polar bear populations are threatened by the disappearance of sea ice due to climatic warming in the Arctic. Moreover, FWS concluded that the impacts of global climate change and oil and gas activities will have cumulative impacts in the Beaufort Sea. *See* 72 Fed. Reg. at 1,079 ("Climatic warming at predicted rates in the Beaufort Sea region is likely to have serious consequences for ringed seals and polar bears, and those effects will accumulate with the effects of oil and gas activities in the region."). FWS is legally obligated to reach a final listing determination for polar bears within 12 months of the proposed rule.

**C. The History of Oil and Gas Development in the Region**

43. Oil was discovered in Prudhoe Bay in 1967. Since that time, according to FWS's EA, "the Prudhoe Bay oil field has developed into an expansive industrial complex."

44. Oil and gas development has expanded into areas of the North Slope beyond Prudhoe Bay. In 1993, the North Slope contained seven producing oil fields. By 2006, that number had increased—nearly four-fold—to twenty-six producing fields, divided into eight oil and gas units. Oil and gas development, though not production, is underway within three additional units.

45. The number of offshore facilities has also increased since 1993. In 2001, the Northstar facility entered production. The Minerals Management Service has held lease sales for offshore oil and gas deposits in the Beaufort Sea in 2003 and 2005. Another such lease sale is scheduled for April 2007.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

11

46.     Within the ensuing five years, FWS anticipates exploration activities to occur in at least five additional offshore locations and at least three new onshore locations. FWS anticipates development activities to begin in at least two new offshore locations and three new onshore locations during that time. FWS notes that recent and planned lease sales may ultimately lead to the development of over 1.8 million acres of oil and gas deposits onshore. Recently sold offshore leases cover a swath of the outer-continental shelf along the coast of the Beaufort Sea that spans a substantial portion of the coast.

47.     These anticipated activities may disturb polar bears that congregate or den in coastal areas and impede bears as they migrate between sea-ice and coastal areas.

## D. The Rule Promulgated by FWS Enabling Incidental Taking of Polar Bears

48.     In 1993, FWS first promulgated regulations for the incidental taking of polar bears and Pacific walrus during oil and gas operations in the Beaufort Sea and adjacent coastal areas. FWS issued subsequent incidental take regulations in 1999, 2000 and 2003. On August 2, 2006, FWS promulgated the current regulations, which have a five-year duration.

49.     FWS has issued at least seventeen LOAs pursuant to the 2006 incidental take regulations. None of these has been made available for public comment.

50.     The incidental take regulations enable polar bears and Pacific walrus to be taken during any activity conducted during any phase of oil and gas operations, including exploration, development and production. These operations include onshore and offshore activities, permanent and seasonal activities, and development and remediation activities, including but not limited to: seismic exploration (both underwater and on land or ice); sub-sea sediment sampling; construction and use of drilling structures; construction and use of roads, pipelines, runways and camps; well drilling; transportation of materials and personnel (by automobile, airplane, helicopter, boats, barges, rolligons, cat trains and snowmobiles); and oil production and transportation.

51.     The regulations anticipate that these various activities may result in the taking of polar bears and Pacific walrus due to auditory disturbance caused by stationary facilities, mobile vessel-based exploration activities, vessel traffic, air traffic, and seismic exploration. In the past, such disturbance has caused polar bears to prematurely abandon maternal dens, resulting in the death of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

12

1  cubs. In addition, the regulations anticipate that polar bears and Pacific walrus will be taken by
2  offshore and coastal facilities and associated infrastructure physically obstructing their movement,
3  disturbance of their prey species by various industrial activities, and active harassment of polar bears
4  and Pacific walrus by oilfield workers.

5      52.     Depending on its timing, nature, and location, a given activity may disturb reproductive
6  processes by preventing polar bears from using preferred denning locations, causing polar bears to
7  prematurely abandon maternity dens, or interfering with pregnant females' hunting. A given activity
8  may interfere with the migratory and non-migratory movement of polar bears and Pacific walrus.
9  Certain activities may even attract bears and lead to intentional takes of bears—for example driving
10 polar bears off with vehicles, using pepper spray or other chemical deterrents, or shooting polar bears
11 with rubber bullets.

12     53.     Seismic activities may displace Pacific walrus or damage their hearing or displace
13 ringed seals, polar bears' primary prey. Vessel or aircraft traffic may cause Pacific walruses to trample
14 calves.

15     54.     Oil drilling or transport may cause sub-lethal harm to polar bears' or Pacific walruses'
16 health by exposure to oil and other pollutants. Although the incidental take regulations do not
17 authorize lethal takings, exploration, production or transportation activities may cause bear or walrus
18 deaths, by, for instance, a bear or walrus ingesting a lethal dose of spilled oil.

19     55.     The incidental take regulations impose a mitigation measure requiring that all holders of
20 LOAs have "an approved polar bear and/or walrus interaction plan." 50 C.F.R. § 18.128(c). The
21 regulations enumerate the required elements of such plans, which include "[a] food and waste
22 management plan," "[p]ersonnel training materials and procedures," "[s]ite at-risk locations and
23 situations," and "[b]ear/walrus avoidance and encounter procedures." 50 C.F.R. § 18.128(c)(1)-(4),
24 (6). The regulations do not further detail how FWS will evaluate the adequacy of the required elements
25 of such plans, nor do they provide yardsticks by which FWS will measure the effectiveness of the
26 implementation of such plans. These plans will not be subject to public review.

27     56.     The regulations identify, but do not actually impose, several mitigation measures
28 specifically designed to avoid impacts to pregnant polar bears' denning behavior. The regulations

COMPLAINT FOR DECLARATORY                                                          13
AND INJUNCTIVE RELIEF

indicate that FWS "will require a 1-mile exclusion buffer" around a polar bear den "or require that the operator conduct activities after the female bears emerge" from dens "[i]f known occupied dens are located within an operator's area of activity." 50 C.F.R. § 18.128(e)(5). Nevertheless, the regulations do not mandate these protective measures. Instead, they enable FWS, on a case-by-case basis, to authorize activities to proceed within one mile of a known, occupied den.

57. The locations of the large majority of active polar bear dens are unknown. Thus, even if imposed as a condition of each LOA, a one-mile exclusionary buffer could prevent potential impacts to "only a small percentage" of denning females. *See* 71 Fed. Reg. at 43,935.

58. In order to avoid disturbing bears in dens whose locations are unknown, the incidental take regulations present three potential mitigation measures: restriction or prohibition of industrial activity in known denning habitat until after bears have quit their dens; use of forward looking infrared (FLIR) imagery to survey denning habitat within "Industry activity areas" for occupied dens; and surveys by scent-trained dogs to locate occupied dens. The regulations do not impose any of these protective measures. Rather, the regulations defer the decision when, how and even whether to impose these mitigation measures until the issuance of individual LOAs. Nevertheless, FWS's analysis of the impact on the Southern Beaufort Sea polar bear population resulting from incidental takings assumes the application of these mitigation measures.

59. The rapid proliferation of industrial activities since 1993 has been accompanied by increasingly frequent polar bear takes and harassment incidents. In the seven year period between 1994 and 2000, oil and gas operations reported 258 polar bear sightings (an average of just over thirty-seven per year) and sixty-six instances of direct harassment of polar bears (an average of fewer than ten per year). In 2004, oil and gas operations reported eighty-nine sightings and thirty-six instances of direct harassment of polar bears. In 2005, the number of polar bear sightings increased to 112. Two offshore oil production facilities, Endicott and Northstar, accounted for sixty-three percent of all polar bear sightings in 2004.

60. Additional development of offshore facilities will likely increase the frequency of polar bear sightings and harassment incidents. FWS attributes this rise in polar bear observations in recent years to increased monitoring effort. FWS does not provide any evidence or rationale in support of its

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

14

1   explanation for the recent upsurge in polar bear observations. FWS does not identify a purported cause
2   of the recent escalation of harassment incidents.

3       61.     Despite the upsurge in the frequency of polar bear observations and harassment
4   incidents in recent years, FWS presumes that during the ensuing five years, industry will continue to
5   take polar bears at a level comparable to that which occurred under previous versions of the incidental
6   take regulations. FWS surmises that the take of polar bears by industry under previous regulations had
7   a negligible impact on the Southern Beaufort Sea population. FWS, however, admittedly lacks data by
8   which to discern whether past harassment incidents affect the population over the long term.
9   Nevertheless, based on its anticipation that the level of take under the current regulations will remain
10  comparable to that which occurred under previous regulations, FWS made a finding that the incidental
11  take enabled by the current regulations will have a negligible impact on Southern Beaufort Sea polar
12  bears.

13      62.     FWS acknowledges that global warming may alter the timing of sea-ice formation and
14  its extent, causing bears to become stranded in coastal areas more frequently and for longer durations.
15  The regulatory pre-amble concedes that changes in the distribution of polar bears during the fall will
16  likely cause industrial operations more frequently to harass and otherwise take polar bears.
17  Consequently, FWS's negligible impact finding depends on the effectiveness of these mitigation
18  measures and their increasingly frequent implementation. Yet, with the exception of polar bear
19  interaction plans, the regulations fail to mandate any of these mitigation measures.

20      63.     While FWS acknowledges that global climate change may alter polar bears' spatial-
21  temporal distribution, the agency fails to evaluate resultant deterioration of polar bears' health and
22  reproductive fitness. Researchers have established that reductions in sea ice in Hudson Bay resulted in
23  deterioration of polar bears' physiological health and declines in reproductive success and survival.
24  Nevertheless, FWS fails to evaluate the potential impacts of global climate change on polar bears'
25  health, survival and reproductive success in the Beaufort Sea. Consequently, FWS necessarily fails to
26  evaluate the complex interactions by which the taking of polar bears in the course of oil and gas
27  activities works in concert with global climate change to affect polar bears' health, and ultimately
28  reproductive success and survival. For example, FWS does not consider whether industrial disturbance

COMPLAINT FOR DECLARATORY                                                    15
AND INJUNCTIVE RELIEF

1  that deters a female from her preferred den location may exacerbate the depletion of her fat stores
2  caused by progressively shorter seal hunting seasons and progressively longer swims across open water
3  to reach the shore from the increasingly distant ice edge. Nor does FWS consider whether such
4  physiological impacts may inhibit reproductive success.

5      64.    The FWS decision does not assess the degree to which climate change and consequent
6  changes to sea ice may affect the spatial distribution of Pacific walruses—particularly their utilization
7  of the Beaufort Sea—or the population's rates of survival and recruitment.

8      65.    The Marine Mammal Commission commented on the proposed regulations. The Marine
9  Mammal Commission recommended that the FWS "conduct a more comprehensive analysis" of oil and
10  gas operations subject to the regulations and consider "the direct effect of these operations together
11  with (1) other oil and gas activities that affect these populations, (2) other natural and anthropogenic
12  risk factors (e.g., climate change), and (3) the cumulative effect of all these activities over time." The
13  Marine Mammal Commission also recommended that FWS "require that the regulations include a
14  description of mitigation measures that will be established to minimize impacts to polar bears so that
15  the public can evaluate the potential efficacy of those measures." FWS did not follow the Marine
16  Mammal Commission's recommendations.

17  **E. The NEPA Process**

18      66.    On April 21, 2006, FWS published a draft EA that purported to describe the
19  environmental impacts of the incidental take regulations. In June 2006, FWS finalized the EA.

20      67.    The EA identifies two needs for the issuance of incidental take regulations: FWS's
21  obligation, pursuant to the MMPA, to issue regulations in response to a petition, provided that it makes
22  certain statutorily required findings; and the agency's need for information about polar bears that can
23  be gained from the monitoring reports that industry must provide under the regulations. The EA
24  considers only the proposed action and a no-action alternative. The EA declines to evaluate an
25  alternative by which FWS would issue separate incidental take regulations for discrete classes of
26  specific activities related to oil and gas exploration and extraction.

27      68.    FWS's evaluation of environmental impacts in the EA incorporates the same suite of
28  mitigation measures that are identified but not imposed by the regulations. The EA does not

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
16

1  quantifiably assess or establish the effectiveness of identified mitigation measures.

2  69.  The EA evinces substantial uncertainty concerning the impacts to the Southern Beaufort
3  Sea polar bear population from past, present and future oil and gas operations. The EA predicts that the
4  effects to polar bears of industrial activities enabled by the current regulations will occur on a level
5  similar to that which occurred under previous versions of the incidental take regulations. FWS lacks,
6  however, any data that indicates whether the takings of bears that occurred under earlier versions of the
7  regulations have a long-term effect on the Southern Beaufort Sea polar bear population.

8  70.  Despite acknowledging that climate change is already altering sea-ice, polar bears'
9  primary habitat, and that the Southern Beaufort Sea population is already making increasingly heavy
10  and protracted use of coastal areas, the EA discusses global climate change as a factor that may affect
11  polar bears "in the future." United States Fish and Wildlife Serv., Envtl. Assessment: Final Rule to
12  Authorize the Incidental Take of Small Numbers of Polar Bears (Ursus maritimus) and Pacific walrus
13  (Obodensus rosmarus divergens) During Oil and Gas Activities in the Beaufort Sea and Adjacent
14  Coastal Alaska, 68 (2006) ("EA"). The EA notes that in the future global climate change may affect
15  polar bears' spatial temporal distribution, and potentially reduce the Southern Beaufort Sea
16  population's rates of survival and recruitment. The EA does not, however, quantify or further evaluate
17  how the anticipated impacts of industrial activities might exacerbate these harms caused by climate
18  change. Rather, the EA forgoes further evaluation of these cumulative impacts, based on its
19  characterization of climate change as a future concern and the five-year duration of the regulations. It
20  concludes only that changes attributable to climate change "may increase" the cumulative impacts of
21  incidental and intentional takes by oil and gas operations. EA at 69. The EA fails to discuss the
22  impacts of global climate change on Pacific walrus or the resultant consequences for the impacts of
23  takes to Pacific walrus.

24  71.  The EA acknowledges that the expansion of oil and gas development in the Beaufort
25  Sea and adjacent coastal areas causes cumulative impacts that increase the potential for adverse effects
26  to Pacific walrus and polar bears. Yet, the EA avoids further analysis of the cumulative impacts of
27  industrial expansion based on the five-year duration of the regulations.

28  72.  FWS nonetheless made a finding of no significant impact (FONSI) and declined to

COMPLAINT FOR DECLARATORY                                                  17
AND INJUNCTIVE RELIEF

1    prepare an EIS for the incidental take regulations. Like the EA, FWS's FONSI declines to discuss in
2    detail the impacts that climate change and consequent reductions in sea ice will have on polar bears'
3    physical health, or the Southern Beaufort Sea population's rate of survival and recruitment. Nor does it
4    analyze in detail the potential for takings by industrial activities to exacerbate impacts of global climate
5    change on polar bears' physiological health, reproduction and survival. The FONSI identifies probable
6    changes in the spatial-temporal distribution of the Southern Beaufort Sea polar bear population, but
7    depends on unimposed mitigation measures, such as cessation of activities, to ensure that oil and gas
8    activities will have no significant impact on the Southern Beaufort Sea polar bear population.

9                                    **VI. CLAIMS FOR RELIEF**

10                                         **CLAIM I**

11             **(Violation of the Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq*.)**

12           73.     Each and every allegation set forth in the Complaint is incorporated herein, by reference.

13           74.     The MMPA requires any person wishing to incidentally take polar bears or Pacific
14    walrus to obtain prior authorization from FWS. *See* 16 U.S.C. § 1371. Before granting incidental take
15    authorization for a duration exceeding one year, FWS must promulgate regulations, after notice and
16    opportunity for public comment.   16 U.S.C. § 1371(a)(5)(A)(i).   The MMPA allows FWS to
17    promulgate such regulations for only a specified activity, meaning one that will have substantially
18    similar effects on marine mammals. 16 U.S.C. § 1371(a)(5)(A)(i); 50 C.F.R. § 18.27(c).

19           75.     FWS issued regulations enabling the taking of polar bears and Pacific walrus by entities
20    engaged in every conceivable activity related to onshore and offshore oil and gas operations. These
21    diverse activities affect polar bears and Pacific walrus in many distinct ways. FWS's issuance of such
22    broad incidental take regulations exceeds the statutory and regulatory limits on FWS's authority to
23    issue incidental take regulations and violates the MMPA.

24           76.     Before granting incidental take authorization, FWS, after notice and opportunity for
25    public comment and based on the best available scientific evidence, must find that the total of such
26    taking during the period of authorization will have a negligible impact on the affected population. *See*
27    16 U.S.C. § 1371(a)(5)(A)(i); 50 C.F.R. § 18.27(b). This negligible impact finding must be made upon
28    issuance of the incidental take regulations. *See* 16 U.S.C. § 1371(a)(5)(A)(i); 50 C.F.R. §§ 18.27(d)-

COMPLAINT FOR DECLARATORY                                                                    18
AND INJUNCTIVE RELIEF

(f). To make a negligible impact finding, FWS must make an objective determination that the "specified activity . . . is not reasonably likely to" adversely affect the population's "annual rates of recruitment or survival." 50 C.F.R. § 18.27(c). FWS's negligible impact determination must evaluate all important aspects of potential impacts to polar bears' reproduction, recruitment and survival.

77. FWS improperly determined that the incidental takes enabled by its regulations will have a negligible impact on the affected polar bear population. FWS's negligible impact finding is based on the effectiveness of mitigation measures that the incidental take regulations fail to impose. The regulations fail to set forth clear criteria for determining when, how and even whether these mitigation measures will be implemented. Although the regulations require holders of LOAs to have a polar bear interaction plan, the specific substantive contents and requirements of such plans are deferred until issuance of individual LOAs. Accordingly, FWS arbitrarily concluded that the total incidental take would have a negligible impact on polar bears.

78. FWS failed to assess fully the adverse consequences of global warming on polar bears and walrus and, in particular failed to evaluate the combined effects of global warming and the taking of polar bears and walrus by industrial operations. FWS dismissed the combined effects of polar bears' increasing use of coastal areas as the sea ice shrinks and the expansion of industrial facilities across such areas, basing its negligible impact finding on an arbitrary presumption that the level of taking will remain relatively constant. FWS failed to examine the effects of global warming on the physical health, reproductive success and survival of polar bears and the combined effects of those impacts with the impacts of industrial activities. FWS also failed to employ the most recent and best available science relating to the impacts of sea-ice retreat on Pacific walrus. This information, including sightings of juvenile walrus separated from their mothers in the Beaufort Sea, indicates that Pacific walrus populations are likely more vulnerable to takings from industrial activities than FWS acknowledges. These are important aspects of the potential impacts of incidental takes on polar bears' and Pacific walruses' successful reproduction, recruitment and survival. Consequently, FWS's findings that the taking of polar bears and Pacific walrus will have negligible impacts on the affected populations are based on an incomplete assessment of key factors and are arbitrary and capricious.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

19

1    79.    Defendants' incidental take regulations are arbitrary, capricious and violate the MMPA,
2  16 U.S.C. § 1371(a)(5)(A)(i), and the APA, 5 U.S.C. §§ 702, 706.

3                                        **CLAIM II**

4            **(Violation of the National Environmental Policy Act, 42 U.S.C. § 4321-4370f)**

5    80.    NEPA requires a federal agency to prepare an EIS for a proposed agency action that
6  may have a significant effect on the environment. *See* 42 U.S.C. § 4332(C). An agency may first
7  prepare an EA to evaluate the environmental impacts of the proposed action and to determine whether
8  the proposed action will have significant environmental effects requiring preparation of an EIS. 40
9  C.F.R. § 1508.9. If, after preparation of an EA, substantial questions persist whether the proposed
10  action will have significant environmental effects, an agency must prepare an EIS.

11    81.    An EA must take a hard look at the environmental impacts of a proposed agency action,
12  evaluating all important aspects of such impacts, and make a reasoned decision based on the facts
13  found. *See* 5 U.S.C. § 706. An EA must evaluate reasonable alternatives to the proposed action. 40
14  C.F.R. § 1508.9.

15    82.    An agency may rely on mitigation measures to support a finding of no significant
16  impact, but such measures must first be adopted. *See* 40 C.F.R. §§ 1502.14(f), 1502.16(h). An agency
17  may not issue a finding of no significant impact that depends on the efficacy of mitigation measures
18  when substantial questions persist over the efficacy of such measures. *See* 40 C.F.R. § 1508.27(5).

19    83.    An EA must contain a detailed or quantified discussion of cumulative impacts. An
20  agency may not avoid the significance of cumulative impacts by terming an action temporary. 40
21  C.F.R. § 1508.27(b)(7).

22    84.    Among other factors, if the effects of an action, in combination with other actions or
23  conditions, may have cumulatively significant environmental impacts, if an action may affect a species
24  listed as threatened, if the possible effects of an action are highly uncertain, or if the effects of an action
25  are highly controversial, an agency may not issue a finding of no significant impact; rather, an agency
26  must prepare an EIS. 40 C.F.R. § 1508.27.

27    85.    FWS expressed substantial uncertainty in the EA concerning the long-term effects of
28  past, present and future industrial activities on the Southern Beaufort Sea polar bear population. This

COMPLAINT FOR DECLARATORY                                                                    20
AND INJUNCTIVE RELIEF

1   uncertainty is compounded by FWS's failure to evaluate in detail how incidental takes may amplify
2   impacts to polar bears due to climate change. FWS impermissibly issued a finding of no significant
3   impact in the face of such uncertainty.

4       86.    The EA impermissibly relies upon mitigation measures that have not been adopted or
5   imposed, whose efficacy is insufficiently supported, and for which FWS provides neither criteria for
6   measuring success nor standards governing proper application.

7       87.    The EA provides perfunctory analysis concerning the cumulative impacts of the
8   increasingly pervasive activities of the oil and gas industry amidst the alteration of the Arctic wrought
9   by global warming. The EA acknowledges that expanding industrial activities may cumulatively affect
10  polar bears and Pacific walrus. Yet, the EA fails to provide a detailed or quantified discussion of such
11  impacts, invoking the temporary duration of the incidental take regulations to justify forgoing such
12  analysis. Likewise, the EA declines to provide a detailed or quantified discussion of the impacts of
13  takings of polar bears and Pacific walrus in the context of global climate change. Instead, the EA
14  arbitrarily dismisses global climate change as a future concern. By so doing, FWS failed to evaluate
15  relevant factors and failed to provide a detailed or quantified analysis of cumulative impacts.

16      88.    FWS's stated need for the incidental take regulations does not preclude consideration of
17  alternatives by which FWS would promulgate separate incidental take regulations, each covering only a
18  discrete specified activity. By considering and evaluating only the proposed action and a no-action
19  alternative, FWS failed to consider a reasonable range of alternatives to the proposed action.

20      89.    Faced with highly controversial, highly uncertain, and potentially cumulatively
21  significant impacts to a species proposed to be listed as threatened, FWS impermissibly declined to
22  prepare an EIS.

23      90.    Defendants' reliance on mitigation measures that the regulations do not impose, their
24  uncertainty concerning long-term effects to polar bears, their failure to consider a reasonable range of
25  alternatives, and their failure to provide an adequate analysis of the cumulative impacts in the context
26  of a warming climate render the EA and finding of no significant impact arbitrary, capricious and not in
27  accordance with law. *See* 42 U.S.C. § 4332; 40 C.F.R. §§ 1500 *et seq*.; 5 U.S.C. §§ 702, 706. Despite
28  substantial questions whether incidental takings will have significant environmental impacts,

COMPLAINT FOR DECLARATORY                                                                    21
AND INJUNCTIVE RELIEF

1 | defendants arbitrarily and capriciously failed to prepare an EIS, in violation of NEPA and the APA.

2 | *See* 42 U.S.C. § 4332; 40 C.F.R. §§ 1500 *et seq*.; 5 U.S.C. §§ 702, 706.

3 | **VII. PRAYER FOR RELIEF**

4 | WHEREFORE, Plaintiffs request that this Court enter judgment providing the following relief:

5 | 1. Declare that Defendants have violated the MMPA, NEPA and the APA and that the

6 | actions as set forth above are arbitrary, capricious and not in accordance with law;

7 | 2. Enter appropriate injunctive relief to ensure that the Defendants comply with NEPA, the

8 | MMPA and the APA and to prevent irreparable harm to the Plaintiffs and to the environment until such

9 | compliance occurs;

10 | 3. Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant

11 | to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

12 | 4. Grant such other relief as the Court deems just and proper.

13 |

14 | **CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

15 | Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named

16 | parties, there is no such interest to report.

17 |

18 | Dated: February ⎿3⏌, 2007.

19 | Respectfully submitted,

20 |

21 | GREGORY C. LOARIE (CA Bar # 215859)

22 | Earthjustice
   426 Seventeenth Street, 5th Floor

23 | Oakland, CA 94612

24 | (510) 550-6725
   (510) 550-6749 [fax]

25 | gloarie@earthjustice.org

26 | R. CLAYTON JERNIGAN (AK Bar # 0611099)
   ERIC P. JORGENSEN (AK Bar # 894010)

27 | Earthjustice

28 | 325 Fourth Street

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

22

Juneau, AK 99801-1145
(907) 586-2751
(907) 463-5891 [fax]
cjernigan@earthjustice.org
ejorgensen@earthjustice.org
*Pro hac vice* (applications to be filed)

BRENDAN CUMMINGS (CA Bar # 193952)
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
(760) 366-2232 x 304
(760) 366-2669 [fax]
bcummings@biologicaldiversity.org

Attorneys for Plaintiffs Center for Biological Diversity
and Pacific Environment

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

23